**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CHRISTOPHER EDWARD HOWARTH, : | | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:16–cv–1844 (JCH) |
| v. | : | |
| | : | |
| NANCY A. BERRYHILL, Acting | : | DECEMBER 19, 2017 |
| Commissioner, Social Security | : | |
| Administration, | : | |
| Defendant. | : | |

**RULING RE: MOTION FOR ORDER REVERSING THE COMMISSIONER'S
DECISION (DOC. NO. 17) & MOTION FOR ORDER AFFIRMING THE
COMMISSIONER'S DECISION (DOC. NO. 25)**

## I.    INTRODUCTION

Plaintiff Christopher Edward Howarth brings this action under Title 42, section

405(g) of the United States Code, appealing from the final decision of the Commissioner

of the Social Security Administration ("SSA"), which denied his application for Title II

disability insurance benefits and Title XVI supplemental security income.  See

Complaint ("Compl.") (Doc. No. 1).  Howarth seeks reversal of the Decision, affirming

the Commissioner's denial, rendered by Administrative Law Judge ("ALJ") Matthew

Kuperstein and affirmed by the Appeals Council.  See Motion for Order Reversing the

Commissioner's Decision ("Mot. to Reverse") (Doc. No. 17).  The Commissioner cross-

moves for an order affirming that Decision.  See Defendant's Motion for Order Affirming

the Decision of the Commissioner ("Mot. to Affirm") (Doc. No. 25).

For the reasons set forth below, the Motion for Order Reversing the

Commissioner's Decision is **GRANTED**.  The Motion for an Order Affirming the Decision

of the Commissioner is **DENIED**.  The case is remanded to the ALJ for proceedings

consistent with this Ruling.

1

## II.    PROCEDURAL HISTORY[1]

Howarth applied for disability and supplemental security income benefits on May 24, 2013.  Memorandum in Support of Mot. to Reverse ("Mot. to Reverse Mem.") (Doc. No. 17-1) at 2.  Howarth initially alleged a disability onset date of October 27, 2011, but later amended it to December 7, 2011, the day after his prior employment terminated. Id.; see also Certified Transcript of Record ("Tr.") at 237.  The Commissioner denied Howarth's application initially on October 2, 2013, and again upon reconsideration on December 19, 2013.  Mot. to Reverse Mem. at 2.  On February 7, 2014, Howarth requested a hearing, which was held before ALJ Kuperstein on December 3, 2014.  Id.

On April 3, 2015, ALJ Kuperstein issued an unfavorable Decision affirming the Commissioner's denial and finding that Howarth was not disabled.  Id.; see also Tr. at 12–25.  Specifically, ALJ Kuperstein found that Howarth's impairment did not meet or medically equal the severity of Listing 12.04, see Tr. at 15–17, and that, with his level of residual functional capacity ("RFC"), there were jobs in the national economy that Howarth could perform, see Tr. at 23–24.  Howarth requested review by the Appeals Court on June 3, 2015, and the Appeals Court denied the request on September 12, 2016.  Mot. to Reverse Mem. at 2; see also Tr. at 1–8.  Following that denial, ALJ Kuperstein's April 3, 2015 Decision became a final decision reviewable by this court. Howarth filed this case on November 9, 2016.  See Compl.

---

[1] The procedural history set forth herein is derived from Howarth's Statement of the Case, to which the Commissioner stipulated.  See Mot. to Reverse Mem. at 2; Memorandum in Support of Mot. to Affirm ("Mot to Affirm Mem.") (Doc. No. 25) at 3.

## III.    FACTS

The court adopts the facts as stated in the Plaintiff's Proposed Stipulation of Facts, to which the Commissioner stipulated.  See Plaintiff's Proposed Stipulation of Facts ("Stip. of Facts") (Doc. No. 17-2); Memorandum in Support of Mot. to Affirm ("Mot. to Affirm Mem.") (Doc. No. 25) at 3.  Only those facts relevant to the issues raised in the Motions before the court are set forth below.

Howarth was diagnosed with bipolar affective disorder in 1987 at age 17.  Stip. of Facts at 2.  He was hospitalized for a month in 1987, three times in 1991 and 1992, and again in 2005 and 2011.  See id. at 2–3.  From November 1997 to December 2005, he worked for an annuity company as a client service representative.  Id. at 2.  Then from January 2007 to December 2011, he worked as a customer service representative for Denta Quest.  Id.  Because the "position was extremely stressful" and he was unable to "perform the job functions," he resigned in December 2011.  Id. at 2–3.

Howarth has since been seen by a number of psychiatrists and other therapists, including Dr. Kamau Collins, Dr. Afroze Muneer, Dr. Lisa Reichard, Dr. Michael Torres, social worker Ellen Schnier, APRN Sylvia Rasie, Dr. Neil Parker, Dr. Thomas Truss, social worker Paul Clark, and therapist Richard Conover.  See id. at 2–13.  In 2012, Howarth moved to Maryland to live near his brother and, at that time, reported manic symptoms including "racing thoughts, increased sense of self, and decreased focus," as well as "episodes of depression with less energy, increased sleep, decreased interest in pleasurable activities, worse concentration, decreased sense of self, psychomotor retardation, and recurrent thoughts of death."  Id. at 3.  By November 2012, he had seen little improvement despite treatment, and in January 2013, he expressed frustration with his lack of progress.  See id. at 4–5.  From February 16 to February 26, 2013, Howarth

3

was hospitalized "after progressive worsening moods, irritability and inadequate sleep over the previous two weeks." Id. at 5.  After being stabilized, he was discharged "in fair condition with a fair prognosis" and a "comprehensive treatment plan."  Id.

Howarth moved to Connecticut in 2013 and continued treatment with a number of the above listed practitioners into 2014.  See id. at 6–11.  In November 18, 2013, Nurse Rasie and Dr. Randall completed a mental status questionnaire, noting "[s]ignificant improvement."  See id. at 7.  His healthcare providers continued to note a variety of symptoms, including ongoing depression.  See id. at 8–9.  In October 2014, Howarth presented to therapist Conover with manic symptoms, including elevated mood, difficulty sleeping, tangential presentation, and grandiose effect.  See id. at 11.  Conover considered that these symptoms could be due to his mother's recent absence to Florida.  See id. at 11.  Howarth's mother and brother returned to assist with his episode, and by the end of the month, his symptoms had improved.  See id. at 11–12.  His mother returned to Florida in November 2014.  See id. at 12.  Howarth is now residing by himself and receiving treatment in Connecticut.  See id. at 12; see also Tr. at 282. The record reflects that Howarth has not been employed since December 7, 2011, the alleged date of onset of disability.  See Stip. of Facts at 3.

## IV.    STANDARD OF REVIEW

Under section 405(g) of title 42 of the United States Code, it is not a function of the district court to review de novo the ALJ's decision as to whether the claimant was disabled.  See Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998).  Instead, the court may only set aside an ALJ's determination as to social security disability if the decision "is based upon legal error or is not supported by substantial evidence."  Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998).  Substantial evidence requires "more than a

4

mere scintilla," but is a "very deferential standard of review." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447–48 (2d Cir. 2012). It requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). If the Commissioner's findings of fact are supported by substantial evidence, those findings are conclusive, and the court will not substitute its judgment for the Commissioner's. 42 U.S.C. § 405(g) (2016); see also Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).

## V.   DISCUSSION

Section 404.1520 of title 20 of the Code of Federal Regulations lays out a five-step sequential evaluation process for determining whether an individual claimant is disabled. 20 C.F.R. § 404.1520 (2017).

> First, the Commissioner of Social Security considers whether the claimant is currently engaged in "substantial gainful activity." If he is not, the Commissioner proceeds to the second step and determines whether the claimant has a "severe medically determinable physical or mental impairment," that "significantly limits his physical or mental ability to do work activities." If the claimant does suffer such an impairment, the third step is "whether, based on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations." If so, the claimant is per se "disabled" and thus presumptively qualified for benefits. If not, the Commissioner proceeds to the fourth step and examines whether, "despite the claimant's severe impairment, he has the residual functional capacity to perform his past work." If the claimant is unable to perform his past work, the Commissioner finally determines whether there is other work the claimant can perform, taking into consideration the claimant's RFC, age, education, and work experience.

Petrie v. Astrue, 412 Fed. App'x 401, 404 (2d Cir. 2011) (internal citations omitted).

In this case, the ALJ found that the first two steps of the sequential evaluation were satisfied—that Howarth was not engaged in substantial gainful employment, and

that his bipolar disorder was a severe impairment.  <u>See</u> Tr. at 14–15.  The ALJ then

found on step three that Howarth's impairment, though severe, did not meet or

medically equal a listed impairment, specifically Listing 12.04.  <u>See</u> Tr. at 15–17.

Finally, under steps four and five, the ALJ determined that Howarth was not able to

perform any past relevant work, but could perform other jobs that exist in significant

numbers in the national economy.  <u>See</u> Tr. at 23–24.

Howarth now argues that the Commissioner's Decision should be reversed and

remanded for two reasons. First, he argues that the ALJ erred in step three of the

analysis by failing "to properly evaluate whether the plaintiff's condition met or equaled

the listing at 12.04."  Mot. to Reverse Mem. at 3.  Second, he argues that the ALJ erred

in steps four and five of the analysis by improperly weighing the treating source opinion

evidence of Nurse Rasie.  <u>See id.</u> at 6–8.

A.    <u>Step Three: ALJ's Finding That Howarth's Condition Did Not Meet or
      Equal Listing 12.04</u>

Step three of the analysis allows that "when . . . an individual's impairment . . .

meets or equals the level of severity described in the Listing, and also meets the

durational requirement, disability will be found on the basis of the medical facts alone in

the absence of evidence to the contrary."  Social Security Ruling 86-8: Titles II and XVI:

The Sequential Evaluation Process ("SSR 86-8"), 1986 WL 68636, at *3 (Jan. 1, 1986).

To meet the listing, the impairment must satisfy all of the criteria in the listing.  <u>Bouton v.</u>

<u>Astrue</u>, No. 3:04-CV-1756RNC, 2007 WL 2889449, at *2 (D. Conn. Sept. 29, 2007).  An

impairment that does not meet the listing can nonetheless be medically equivalent "if it

is at least equal in severity and duration to the criteria of any listed impairment."  20

6

C.F.R. § 404.1526 (2015).[2]  To satisfy this, "the set of symptoms, signs and laboratory findings in the medical evidence supporting a claim must be compared with, and found to be equivalent in terms of medical severity and duration to, the set of symptoms signs and laboratory findings specified in the listed impairment."  SSR 86-8 at *3.

    In this case, the listing at issue is Listing 12.04 for affective disorders.  20 C.F.R. § 404.1525 app. 1, Listing 12.04 (2015).[3]  Listing 12.04 requires the claimant to satisfy the criteria in either both paragraphs A and B or in paragraph C.  Id.  For bipolar syndrome, Paragraph A requires the claimant to establish "a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes." Id.  Paragraph B requires at least two of the following: marked restriction of activities of daily life; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation.  Id.  Paragraph C establishes criteria for claimants with a history of the disorder for at least two years who experience repeated episodes of decompensation, marginal adjustment, or need for a highly supportive living arrangement.  Id.

    The ALJ determined that Howarth satisfied neither paragraph B nor paragraph C and thus failed to establish a disability at step three.  See Tr. at 15–17.  Specifically, the ALJ found that Howarth experienced only mild restriction in activities of daily living; moderate difficulties with social functioning; moderate difficulties with concentration,

---

[2] Several of the relevant social security regulations were amended effective March 27, 2017. Because the ALJ's Decision was issued April 3, 2015, unless otherwise specified, the court cites to the regulations that were effective at the time of the Decision rather than to the most current version.

[3] As noted previously, the court refers to the version of Listing 12.04 that was effective from January 2, 2015 to May 17, 2015, that has since been amended.

persistence, and pace; and one or two episodes of decompensation.  See id. at 16.  The

ALJ then stated that he had considered the criteria in paragraph C and recited the

criteria without any further discussion.  See id.  From the ALJ's ultimate conclusion that

the listing was not met or equaled, the court deduces that he found that paragraph C

was not satisfied, but he does not state so explicitly.  See id. at 15–17.

    Howarth argues that the case should be remanded because the ALJ's decision

at step three was not supported by substantial evidence.  See Mot. to Reverse Mem. at

3.  First, he argues that the ALJ decided that paragraph B was not met or equaled

without discussing any medical evidence in the record, but instead relying solely on the

claimant's own statements.  See id. at 3–4.  He also contends that the ALJ did not

consider all of the episodes of decompensation.  See id. at 5–6.  Second, he argues

that the ALJ found that paragraph C was not met or equaled without discussing the

evidence or articulating his reasons.  See id. at 6.  Third, he argues that the ALJ did not

consider paragraph A.  See id. at 3.  Finally, he argues that the ALJ failed to obtain a

medical opinion on equivalence.  See id. at 5.

    The court first addresses Howarth's argument regarding the ALJ's failure to

articulate reasons for finding that paragraph C was not met or equaled.  Because the

court finds that the ALJ's failure regarding paragraph C is sufficient to justify remand, it

then also suggests that the ALJ revisit the other issues on remand, without finding it

necessary to hold that such errors would themselves warrant remand on their own.

See, e.g., Fly v. Colvin, No. 3:14-CV-1840, 2015 WL 5124957, at *5 (N.D. Ind. Aug. 31,

2015) (requiring the ALJ to revisit its credibility determination without finding that the

error itself required remand because the case was already being remanded for other

reasons); Waltemire v. Colvin, No. 13-CV-1283-DDC, 2014 WL 3809189, at *12 (D. Kan. Aug. 1, 2014); Lowe v. Colvin, No. 2:12-CV-524-PRC, 2014 WL 4373637, at *8 (N.D. Ind. Sept. 3, 2014). Thus, after addressing paragraph C, the court discusses the remaining step three issues in their logical order—first, addressing whether the ALJ met his obligation to receive expert opinion evidence into the record on the question of medical equivalence, and then addressing whether the ALJ sufficiently considered that evidence for paragraphs A and B.

### 1. Paragraph C Criteria

Howarth argues that the ALJ asserted that the paragraph C criteria were considered "without any discussion at all of the evidence in support of the adverse determination." Mot. to Reverse Mem. at 6. The court agrees that the ALJ failed to articulate any reasons at all for his finding that the paragraph C criteria had not been satisfied. The ALJ merely stated that he considered whether the paragraph C criteria were satisfied and then quoted the criteria from the listing. See Tr. at 17.

In determining whether a listing has been met or equaled under step three, the ALJ must consider "all relevant evidence in [the] case record." 20 C.F.R. § 404.1525 app. 1, Listing 12.00(D) (2015). Additionally, the ALJ is required to articulate the specific reasons justifying his decision that the claimant does or does not meet the relevant listing. See Daniels v. Berryhill, No. 3:16CV01181 (SALM), 2017 WL 2798500, at *7 (D. Conn. June 28, 2017); Stango v. Colvin, No. 3:14-CV-01007 (CSH), 2016 WL 3369612, at *14 (D. Conn. June 17, 2016). The failure to articulate reasons can itself be the basis for remand. See Rivera v. Astrue, No. 3:10-CV-01035 CSH, 2014 WL 5419529, at *14 (D. Conn. Oct. 22, 2014) (citing Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982)). This is true when the court "would be unable to fathom the ALJ's

rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ." Berry, 675 F.2d at 469.

In Nieves v. Colvin, the court remanded the ALJ's decision where the ALJ "summarily disposed of step three with conclusory statements that Nieves does not meet either listing, followed by a recitation of the elements of each listing." Nieves v. Colvin, No. 3:15-CV-01842 (JCH), 2016 WL 7489041, at *5 (D. Conn. Dec. 30, 2016); see also Peach v. Colvin, No. 15-CV-104S, 2016 WL 2956230, at *4 (W.D.N.Y. May 23, 2016) ("[T]his court cannot determine whether the ALJ properly considered the Listings because his only reference to them is a recitation of the standard."). The court in Nieves found that the lack of rationale prevented the court from engaging in meaningful review of the ALJ's decision. See Nieves, 2016 WL 7489041, at *6. In Howarth's case, the ALJ's decision does not even include conclusory statements that Howarth does not meet paragraph C. See Tr. at 17. Rather, the court is left to infer that the ALJ reached that decision based on the ALJ's ultimate conclusion that Howarth did not meet or equal the listing. Thus, the ALJ's rationale here is severely lacking, and the ALJ should have articulated specific reasons for rejecting paragraph C.

However, the court is not required to remand if the ALJ's reasons can be discerned from other steps in the ALJ's analysis or from the evidence in the record. See Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983); Berry, 675 F.2d at 469 ("[I]n spite of the ALJ's failure to explain his rejection of the claimed listed impairments, we were able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his decision was supported by substantial evidence."). When the ALJ's reasons can be thus determined, the court has not required the ALJ to "have

mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." Mongeur, 722 F.2d at 1040; see also Encarnacion v. Barnhart, No. 3:05 CV 1084 MRK WIG, 2006 WL 3834235, at *13 (D. Conn. June 15, 2006) (citing Clinton v. Chater, 79 F.3d 1007, 1009–10 (10th Cir. 1996)). In those cases, the ALJ's failure to articulate his reasons can be harmless error. See Fischer-Ross v. Barnhart, 431 F.3d 729, 735 (10th Cir. 2005); Young v. Astrue, No. 1:12-CV-00317-MJD, 2013 WL 501752, at *6 (S.D. Ind. Feb. 8, 2013).

In this case, paragraph C criteria would require Howarth to show one of the following: (1) "repeated episodes of decompensation, each of extended duration;" (2) "a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate;" or (3) "current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." 20 C.F.R. § 404.1525 app. 1, Listing 12.04(C) (2015). As noted above, the ALJ does not address any of these criteria in his sparse discussion of paragraph C. While the court is able to determine the ALJ's rationale for finding that criterion (1) and (3) are not satisfied based on the rest of the Decision, but the Decision does not contain the ALJ's reasons for rejecting criterion (2).

Regarding criterion (1), the ALJ found in his discussion of the paragraph B criteria that Howarth experienced one or two episodes of decompensation and therefore did not satisfy the criteria for "repeated" episodes of decompensation. See Tr. at 16–

17.[4]  Although the ALJ did not repeat this discussion when reciting the paragraph C

criteria, the court can discern that the ALJ applied the same rationale from the earlier

finding to reject this element of paragraph C, as the criterion is the same.

Regarding criterion (3), the ALJ's discussion of paragraph B and the RFC under

step four also preclude a conclusion that Howarth is unable to function outside of a

_____

[4] Howarth challenges the ALJ's finding under paragraph B that Howarth only experienced one or two episodes of decompensation.  See Mot. to Reverse Mem. at 3–4.  However, the court does not find that the ALJ erred in this regard for the reasons below.  Therefore, the ALJ's paragraph B analysis provides sufficient consideration of the evidence to satisfy this same criteria under paragraph C as well.

Howarth argues that the ALJ failed to credit two additional episodes of decompensation when he found that Howarth only experienced one or two decompensations of extended duration.  See Mot. to Reverse Mem. at 5–6.  Specifically, Howarth cites a hospitalization from July 12 to July 25, 2011, following a two-week manic episode and another episode of decompensation in October 2014.  See id. at 6; see also Stip. of Facts at 2, 11.  The ALJ's opinion cited only a hospitalization from February 16 to February 26, 2013.  See Tr. at 16.

The court notes first that, even if the ALJ erred in failing to cite these episodes, Howarth would still have failed to meet his burden because paragraph B requires two of the four elements to be met, and repeated episodes of decompensation would only meet one element.  See 20 C.F.R. § 404.1525 app. 1, Listing 12.04(B) (2015).  Additionally, the court finds that the ALJ did not err by omitting these two episodes.  The listings effective at the time of the ALJ's Decision in 2015 defined repeated episodes of decompensation as "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."  20 C.F.R. § 404.1525 app. 1, Listing 12.00(C)(4) (2015).  Additionally, "[i]f [the claimant] ha[s] experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence."  Id.

In Howarth's case, the Commissioner correctly notes that neither the July 2011 hospitalization nor the October 2014 decompensation occurred within one year of the February 2013 hospitalization.  See Mot. to Affirm Mem. at 7.  Therefore, even had the ALJ cited these additional episodes, they would not have satisfied the listing's definition of repeated episodes.  Nor did the ALJ err in finding that Howarth's episodes were not equivalent to the listing.  While less frequent, the evidence does not show that they were all (or most) of longer duration than two weeks each.  The July 2011 hospitalization lasted fourteen days after a two-week manic episode (four weeks), and the February 2013 hospitalization lasted for 11 days (less than two weeks).  See Stip. of Facts 2, 5.  Where the record mentions the October 2014 decompensation, it fails to specify any duration.  See Tr. at 44, 65, 529; Stip. of Facts at 11.  Thus, only one of the episodes was more than two weeks in duration, and the three episodes were spread over a period of over three years.  The ALJ could have found, based on this evidence, that the functional effect of the one longer episode was not equal in severity to compensate for the infrequency of his episodes.  As noted above, the ALJ is not required to discuss every piece of evidence.  See Mongeur, 722 F.2d at 1040; Encarnacion, 2006 WL 3834235, at *13.  His failure to cite additional episodes not within one year of the February 2013 episode or of each other was not in error.

12

highly supportive living arrangement.  The ALJ pointed to evidence that Howarth "lives alone and has no problems caring for his personal care and personal hygiene, such as dressing and bathing."  See id. at 16.  He also prepares daily meals without problems, performs household chores, drives a car, and manages his finances.  See id.  This evidence indicates a degree of independence that is not consistent with requiring a "highly supportive living arrangement."  20 C.F.R. § 404.1525 app. 1, Listing 12.04(C)(3).  Thus, again, the ALJ's findings elsewhere in the Decision provide sufficient guidance for the court to determine the ALJ's rationale despite the ALJ's failure to articulate his reasons.

For both 12.04(C)(1) and (3), then, the ALJ's failure to articulate specific reasons is harmless.  Based on the ALJ's other findings, no reasonable administrative factfinder could have found that Howarth experienced repeated decompensations or required a highly supportive living arrangement.  See Fischer-Ross, 431 F.3d at 735 (applying harmless error to the ALJ's failure to articulate his reasoning where the ALJ's findings elsewhere, "coupled with indisputable aspects of the medical record," indicate that "[n]o reasonable factfinder could conclude otherwise").

The same cannot be said, however, for the second criterion of Listing 12.04(C)(2).  This criterion is satisfied if the claimant can demonstrate "a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate."  20 C.F.R. § 404.1525 app. 1, Listing 12.04(C) (2015).  Unlike with the prior two criteria, the findings in the rest of the ALJ's opinion do not clearly indicate the ALJ's rationale sufficiently for the court to determine whether his

decision is supported by substantial evidence.  Although there is evidence in the record that would support the ALJ's conclusion, there is also evidence that indicates marginal adjustment.  The ALJ's Decision contains no indication that he considered this evidence in relation to the second criterion beyond a conclusory statement that he considered Paragraph C.  See Tr. at 17.  Thus, without an articulation of the ALJ's reasons, the court cannot review whether the ALJ considered the contrasting evidence or how the ALJ reached his conclusion.  See, e.g., Canady v. Colvin, No. CA 5:12-2507-KDW, 2014 WL 878880, at *10 (D.S.C. Mar. 5, 2014); Morris v. Colvin, No. 2:12-CV-595, 2013 WL 3467209, at *5 (S.D. Ohio July 10, 2013), report and recommendation adopted sub nom. Morris v. Comm'r Soc. Sec., No. 2:12-CV-00595, 2013 WL 4008774 (S.D. Ohio Aug. 5, 2013).

On the one hand, the ALJ did make findings in other parts of the decision that Howarth's impairments are only mild to moderate and that he is able to live on his own and take care of his personal needs.  See Tr. at 16.  Additionally, the ALJ credited in step four the opinions of the two state psychological consultants.  See Tr. at 21.  Both consultants stated that the "[e]vidence does not establish the presence of the 'C' criteria."  See id. at 96, 122.  However, neither opinion states the basis for this finding.  See Canady, 2014 WL 878880, at *11 (finding that the opinions of two state medical consultants alone did not constitute substantial evidence that the listing was not met because the reports "do not explain those opinions").

On the other hand, however, there is also evidence in the record that Howarth had a history of hospitalizations that, while not rising to the level of repeated episodes of decompensation under criterion 12.04(C)(1), were nonetheless numerous.  See Tr. at

439 (citing seven hospitalizations since age 17, including three in the past several years); see also id. at 41. Additionally, while Howarth was living alone at the time of the ALJ's decision, the record includes evidence of previous dependence on his mother and brother. See, e.g., Tr. at 44, 529. For example, the trial transcript indicates that he had an episode of decompensation in October 2014, which social worker Conover notes was precipitated by his mother's return to Florida, and had his mother and brother not returned to care for him, his attorney believes he would have been hospitalized again. See id. Because the ALJ provides no discussion regarding the paragraph C criteria at all, the court is unable to determine whether the ALJ considered this evidence.

The court acknowledges that the claimant bears the burden of proof at step three. See Johnson, 2017 WL 2381272, at *1. However, it is the responsibility of the ALJ to articulate the specific reasons for finding that the listing has not been met, including a discussion of "the uncontroverted evidence that supports the claimant's application for benefits, and the significantly probative evidence that he or she rejects." Cross, 2009 WL 3790177, at *3; see also Daniels, 2017 WL 2798500, at *7; Stango, 2016 WL 3369612, at *14. Where, as here, the court cannot discern the ALJ's rationale because the ALJ failed to address the evidence in the record on either side, the ALJ's failure to articulate is itself a sufficient basis to remand. See Rivera, 2014 WL 5419529, at *14.

Accordingly, the court remands for the ALJ to consider the record evidence regarding the paragraph C criteria, specifically 12.04(C)(2), and to articulate specific

reasons for his decision as to whether the listing has been met or equaled.[5]  On

remand, the ALJ is also encouraged to articulate his reasons for rejecting criteria (1)

and (3), even though the court was able to identify his rationale from other portions of

the Decision.

2.    Medical Opinion on Medical Equivalence

Howarth additionally argues that the ALJ failed to obtain medical opinion

evidence on the issue of medical equivalence.  See Mot. to Reverse Mem. at 5.  Given

that the court is already remanding the case to the ALJ for the failure to articulate his

reasons above, the court need not decide whether the failure to obtain a medical

opinion itself requires remand. Instead, the court discusses the issue below to advise

the ALJ to use the opportunity on remand to address the problem.

As noted above, in determining whether a listing has been met or equaled under

step three, the ALJ must consider "all relevant evidence in [the] case record."  20 C.F.R.

§ 404.1525 app. 1, Listing 12.00(D) (2015).[6]  Regarding medical equivalence in

_____

[5] The court notes that since the ALJ's initial Decision in April 2015, the SSA has issued a new
ruling, SSR 17-2p, rescinding and replacing SSR 96-6p.  SSR 17-2p states,

> If an adjudicator at the hearings or AC level believes that the evidence
> already received in the record does not reasonably support a finding that
> the individual's impairment(s) medically equals a listed impairment, the
> adjudicator is not required to articulate specific evidence supporting his
> or her finding that the individual's impairment(s) does not medically equal
> a listed impairment.  Generally, a statement that the individual's
> impairment(s) does not medically equal a listed impairment constitutes
> sufficient articulation of this finding.

SSR 17-2p at *4.  This Ruling, effective March 27, 2017, was not in effect at the time of the ALJ's
Decision in 2015 and thus does not affect our review, but it does govern the ALJ's obligations on remand.

[6] See Cardillo v. Colvin, No. 6:16-CV-134 (CFH), 2017 WL 1274181, at *7 (N.D.N.Y. Mar. 24,
2017) ("First, the ALJ can 'compar[e] . . . the symptoms, signs, and laboratory findings about the
impairment, including any functional limitations that result from the impairment, with the corresponding
criteria shown for the listed impairments.'  Second, if the ALJ chooses not to conduct this comparison, the

particular, SSR 86-8 states, "Any decision as to whether an individual's impairment or impairments are medically equivalent of a listed impairment must be based on medical evidence . . . including consideration of a medical judgment about medical equivalence furnished by one or more physicians designated by the Secretary." SSR 86-8 at *4.

To satisfy this requirement, "longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight." Social Security Ruling 96-6p, Titles II and XVI: Consideration of Administrative Findings of Fact by State Agency Medical and Psychological Consultants and Other Program Physicians and Psychologists at the Administrative Law Judge and Appeals Council Levels of Administrative Review; Medical Equivalence ("SSR 96-6p"), 1996 WL 374180, at *3 (July 2, 1996).[7] Thus, while the ALJ generally has discretion in whether to call a medical expert, a medical opinion is required for determinations of medical equivalence under step three. See Galloway v. Astrue, No. CIV.A H-07-01646, 2008 WL 8053508, at *4 (S.D. Tex. May 23, 2008).[8] Failure to receive such an opinion into

_____

ALJ must 'expressly adopt a medical source statement that discusses the medical evidence and arrives at express conclusions concerning the Listings."); Peach v. Colvin, No. 15-CV-104S, 2016 WL 2956230, at *4 (W.D.N.Y. May 23, 2016) (same). Thus, the ALJ can conduct a comparison of the medical evidence to the listing to determine if the plaintiff has met the listing, but the ALJ requires a medical source statement to determine if the plaintiff medically equals the listing without meeting it.

[7] SSR 96-6p was rescinded and replaced by Social Security Ruling 17-2p ("SSR 17-29"), which became effective on March 27, 2017. Social Security Ruling 17-2p, Titles II and XVI: Evidence Needed by Adjudicators at the Hearings and Appeals Council Levels of the Administrative Review Process to Make Findings About Equivalence ("SSR 17-2p"), 2017 WL 3928306 (Mar. 27, 2017). However, the court applies SSR 96-6p, not SSR 17-29, in its review of the ALJ's decision because SSR 96-6p was effective at the time of the ALJ's decision in 2015.

[8] At least one court has read SSR 96-6p differently, however. See Copenhaver v. Astrue, No. A–09–CA–838–SS, 2011 WL 891617, at *9 (W.D.Tex. Mar. 11, 2011) ("The opinion of a medical expert is not, as Copenhaver suggests, a mandatory part of the Commissioner's [step-three] analysis.").

the record can be a basis for remand.  See Clark v. Comm'r Soc. Sec., No. 16-12167, 2017 WL 4172498, at *7 (E.D. Mich. Aug. 17, 2017), report and recommendation adopted, No. 16-CV-12167-DT, 2017 WL 4122416 (E.D. Mich. Sept. 18, 2017).

SSR 96-6p allows that one way the ALJ satisfies his obligation to obtain a medical opinion on equivalence is through a state agency medical or psychological consultant.  "The signature of a State agency medical or psychological consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) or SSA-832-U5 or SSA-833-U5 (Cessation or Continuance of Disability or Blindness) ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review."  SSR 96-6p at *3.  This also extends to "other documents on which medical and psychological consultants may record their findings."  Id.

In this case, Howarth argues that the ALJ erred in failing to obtain a medical opinion on equivalence as required by SSR 86-8 and 96-6p.  See Mot. to Reverse Mem. at 5.  The Commissioner responds, however, that the ALJ did have before him the medical opinion of Dr. Christopher Leveille, a state psychological consultant.  See Mot. to Affirm Mem. at 8.  Although the ALJ did not expressly cite the opinion at step three, he did attribute the opinions of the state consultants great weight later in the opinion. See Tr. at 21.  In the record, Dr. Leveille and another Dr. Pamela Fadakar, both state psychological consultants, opined that Howarth's impairment did not meet the criteria in Listing 12.04.  See Tr. at 96, 122.  Neither opinion, however, expressly addressed whether his impairment medically equaled the criteria.  The issue before the court, then,

is whether their reports satisfy the ALJ's requirement to receive a medical opinion into the record or whether an additional opinion was required specifically as to equivalence.

The case law does not present a clear consensus as to whether forms signed by state consultants that do not explicitly address equivalence are sufficient to satisfy the ALJ's obligation. Courts in some districts have held that such forms do not satisfy the ALJ's obligation under SSR 96-6p if they do not address equivalence. See Oberlin v. Colvin, No. 3:14-CV-2101-JVB-CAN, 2016 WL 1237893, at *3 (N.D. Ind. Mar. 30, 2016); Sox v. Astrue, No. CIV.A. 6:09-1609-KFM, 2010 WL 2746718, at *11 (D.S.C. July 2, 2010); Wadsworth v. Astrue, No. 1:07CV0832DFHTAB, 2008 WL 2857326, at *7 (S.D. Ind. July 21, 2008). Some courts hold that whether an impairment meets a listing and whether it medically equals a listing are distinct inquiries. See Stratton v. Astrue, 987 F. Supp. 2d 135, 148 (D.N.H. 2012) ("SSR 96-60 [sic] treats equivalence determinations differently from determinations that an impairment meets a listing, requiring expert-opinion evidence for the former but not the latter."); Clark, 2017 WL 4172498, at *6. These courts reason that, "while an ALJ is capable of reviewing records to determine whether a claimant's ailments meet the Listings, . . . an equivalency finding requires difficult medical judgments as to the severity of a claimant's ailments, judgments that are greatly assisted by consulting an expert." Galloway, 2008 WL 8053508, at *5.

On the other hand, however, other courts have not emphasized the distinction between meeting and medically equaling the listing. At least one court has found the ALJ's obligation to receive a medical opinion on equivalence to be satisfied by a Disability Determination and Transmittal Form that indicated the claimant did not meet the listing. See Huffman v. Berryhill, No. 116CV00930 TWPMJD, 2017 WL 2920687, at

\*6 (S.D. Ind. June 19, 2017), report and recommendation adopted, No. 116CV00930 TWPMJD, 2017 WL 2912509 (S.D. Ind. July 6, 2017).  Reading the requirement even more liberally, some courts have held that "an agency physician necessarily gave the requisite opinion on medical equivalence, albeit not explicitly, where the physician stated that an evaluation of residual functional capacity was required.  Because no assessment of RFC would have been necessary if the physician had found that the claimant's condition was equivalent to a listed impairment, we reasoned that the physician implicitly rejected a determination of equivalence." Carlson v. Astrue, 604 F.3d 589, 593 (8th Cir. 2010).  Therefore, courts following this rule have found the ALJ's obligations under SSR 96-6p to be satisfied where the state consultant's form addressed the RFC even if it did not address equivalence.  See id.; Elwood v. Colvin, No. CIV. 13-3645 JRT/HB, 2015 WL 179391, at \*9 (D. Minn. Jan. 14, 2015).

This District has not yet addressed this issue.  Therefore, no precedent instructs this court as to whether Dr. Leveille's and Dr. Fadakar's reports satisfy the ALJ's obligation to receive into the record a medical opinion on equivalence.  Because the court is already remanding for other reasons, however, it need not resolve the issue for the first time in this case.  Nor is it necessary for the court to perform a harmless error analysis.  On remand, the ALJ has the opportunity to obtain a medical opinion that specifically addresses medical equivalence, and the court urges him to do so.

### 3.    Paragraph B Criteria

Finally, Howarth argues that, even if the record was sufficient, the ALJ decided that his impairment did not meet or equal paragraph B of Listing 12.04 without considering the medical evidence in the record or articulating his reasons based on it. See Mot. to Reverse Mem. at 3–4.  He argues that the ALJ based his decision solely on

Howarth's own statements in the Activities of Daily Living Report (Exhibit 8E) and one reference to hospital records (Exhibit 20F). <u>See</u> Tr. at 16. Thus, Howarth's argument is not that the ALJ failed to articulate reasons for the decision, but that the reasons do not reflect a consideration of the medical opinions in the record.

As noted above, step three requires the ALJ to consider "all relevant evidence in [the] case record." 20 C.F.R. § 404.1525 app. 1, Listing 12.00(D) (2015); <u>see also</u> 20 C.F.R. § 404.1526(c) (2015) ("When we determine if your impairment medically equals a listing, we consider all evidence in your case record about your impairment(s) and its effects on you that is relevant to this finding. . . . We also consider the opinion given by one or more medical or psychological consultants designated by the Commissioner.").[9]

---

[9] A prior version of section 404.1526, effective until March 31, 2006, explicitly stated:

> Medical equivalence must be based on medical findings. We will always base our decision about whether your impairment(s) is medically equal to a listed impairment on medical evidence only. . . . We will also consider the medical opinion given by one or more psychological consultants designated by the Commissioner in deciding medical equivalence.

20 C.F.R. § 404.1526(b) (2006).

However, effective March 31, 2006, the regulations were amended to the language stated above. Evidentiary Requirements for Making Findings About Medical Equivalence, 71 Fed. Reg. 10419-01 (2006). The SSA changed the rule in response to the Seventh Circuit's decision in <u>Hickman v. Apfel</u>, 187 F.3d 683 (7th Cir. 1999) in which the court interpreted the existing language of "medical evidence only" to mean that evidence from nonmedical sources would not be considered. <u>Id.</u> at 10421. The SSA clarified that the phrase "medical evidence only" was intended "only to exclude consideration of the vocational factors of age, education, and work experience." 71 Fed. Reg. at 10421. Medical evidence includes "not just findings reported by medical sources but other information about [the claimant's] medical condition(s) and its effects, including [the claimant's] own description of [his or her] impairment(s)." <u>Id.</u>

While the language of the amended regulation is less explicit regarding medical evidence, it still requires the consideration of all evidence, including medical evidence, and specifically refers to the opinion of the Commissioner's medical or psychological consultant. 20 C.F.R. § 404.1526 (2015). Courts in the Seventh Circuit recognizing the superseding of <u>Hickman</u> have continued to read the regulation as requiring the ALJ to consider medical evidence. <u>See</u> <u>Abernathy v. Colvin</u>, No. 1:15-CV-0553-TAB-TWP, 2016 WL 3157086, at *3 (S.D. Ind. June 7, 2016); <u>L.B.M. ex rel. Motley v. Astrue</u>, No. 1:08-CV-1354-WTL-DML, 2010 WL 1190326, at *15 (S.D. Ind. Mar. 23, 2010) ("[W]hile ALJs must always carefully consider medical source opinions about equivalence, such opinions are never entitled to controlling weight or special significance.").

Specifically, in considering all the evidence, the ALJ should discuss "the evidence that supports his or her decision, the uncontroverted evidence that supports the claimant's application for benefits, and the significantly probative evidence that he or she rejects." Cross v. Astrue, No. 08-CV-0425 (VEB), 2009 WL 3790177, at *3 (N.D.N.Y. Nov. 12, 2009). However, the medical expert's opinion is not binding, as the ALJ is "responsible for deciding the ultimate question of whether a listing is met or equaled." SSR 96-6p at *3; see also 20 C.F.R. § 404.1526(e) (2015).

Additionally, as discussed regarding paragraph C, the ALJ is required to articulate the specific reasons justifying his decision that the claimant does or does not meet the relevant listing. See Daniels, 2017 WL 2798500, at *7; Stango, 2016 WL 3369612, at *14. As with paragraph C, in determining whether remand is necessary, the court can still look to the rest of the ALJ's decision and the evidence in the record to discern the ALJ's rationale and determine if the decision is supported by substantial evidence. See Berry, 675 F.2d at 469; see also Fischer-Ross, 431 F.3d at 733.

Here, the ALJ did not address the medical opinions in the record in his discussion of paragraph B at step three. However, he did address them in step four. See Tr. at 19, 21–22. For instance, in determining Howarth's RFC, the ALJ assessed the treating and examining sources and assigns them weight as required by section 404.1527 of title 20 of the Code of Federal Regulations. See id. at 21–22. He also considered the treatment notes in the record and found them to show that Howarth's symptoms were controlled with treatment and medication and thus "not as disabling as [Howarth] alleges." See id. at 19. As noted above, the court is permitted to look to these other portions of the ALJ's opinion in reviewing whether the decision in step three

was supported by substantial evidence and whether the reasons were sufficiently articulated.  See Berry, 675 F.2d at 469.

In Howarth's case, the ALJ expressly referenced his later RFC discussion in his step three analysis.  See Tr. at 17 ("[T]he following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis.").  In the step four analysis, the ALJ first gave great weight to the two state psychological consultants (Exhibits 3A and 7A).  See Tr. at 21.  Both Dr. Leveille and Dr. Fadakar found that the criteria in paragraph B were not met—specifically, that Howarth experienced only mild restriction of activities of daily living; moderate difficulties with social functioning; moderate difficulties with concentration, persistence, or pace; and one or two episodes of decompensation.  See id.  These conclusions were consistent with and supported by findings under the RFC section of their respective reports, which evaluated Howarth as either "not significantly limited" or "moderately limited" in all categories of concentration/persistence and social interaction.  See id. at 97–98, 123–24.  Although the ALJ did not cite their opinions in step three, his conclusion exactly matches that of Dr. Leveille and Dr. Fadakar.  See id. at 16.

Second, the ALJ gave some weight to the 2013 opinion of social worker Schnier (Exhibit 7F) and gave great weight to the 2013 opinion of Nurse Rasie co-signed by Dr. Randall (Exhibit 8F).  See id. at 21.  In evaluating Howarth's activities of daily living on a scale from 1 (no problem) to 5 (very serious problem), Schnier gave Howarth three scores of 1 (no problem), one score of 2 (slight problem), one score of 3 (obvious problem), and no scores of 4 (serious problem) or 5 (very serious problem).  See id. at

440.  Using the same scale, Schnier gave Howarth one score of 2 and three scores of 3 for social interactions and four scores of 1, one score of 2, and one score of 3 for task performance.  See id. at 441.  Likewise, Nurse Rasie and Dr. Randall evaluated Howarth and gave him four scores of 1 and one score of 2 for activities of daily living; one score of 1 and three scores of 2 for social interactions; and one score of 1, three scores of 2, and two scores of 3 for task performance.  See id. at 444–45.  Neither of these two reports evaluated Howarth as having a score of 4 (serious problem) or 5 (very serious problem) in any of the three categories.  Relying on these and other opinions, the ALJ found in step four that "[t]he record largely documents complaints of symptoms, but does not demonstrate findings of functional deficits or abnormalities."  Tr. at 19.  Thus, evidence from both reports supports the ALJ's conclusion that Howarth does not suffer from marked restriction or difficulty in any of these three categories.

Accordingly, there is substantial medical evidence in the record to support the ALJ's finding that Howarth's impairment did not meet the criteria in paragraph B.  Thus, because the court was able to discern the ALJ's rationale from the evidence in the record and the discussion in step four, the ALJ's failure to explicitly cite the medical evidence would be harmless error not requiring remand.  See Young, 2013 WL 501752, at *6 ("Even if the ALJ should have specifically cited to the state agency's or the other medical opinions in the step three analysis, the error was harmless. . . . Had the ALJ relied on the only medical opinions that discussed the issue of medical equivalence, the outcome would still be the same: Young's impairments did not meet or medically equal a listed impairment.").  However, undoubtedly, the ALJ should have pointed to and discussed these medical opinions in his step three analysis.  Because the court is

remanding already for error on paragraph C, the court urges the ALJ on remand to discuss the medical opinions on paragraph B as well, even though this issue is not itself the basis for the remand.

4.    Paragraph A Criteria

Howarth also argues that the ALJ erred by failing to discuss at all the criteria in paragraph A.  <u>See</u> Mot. to Reverse Mem. at 3.  To meet Listing 12.04, the claimant must satisfy either both paragraphs A and B or paragraph C.  20 C.F.R. § 404.1525 app. 1, Listing 12.04 (2015).[10]  Because the ALJ found that Howarth's impairment did not meet the criteria in paragraph B, it is irrelevant whether it satisfied paragraph A. Therefore, it was not error for the ALJ not to evaluate the criteria in paragraph A. However, if the ALJ changes his conclusion regarding paragraph B on remand, the ALJ is advised that he would then need to consider paragraph A.

B.    <u>Step Four: ALJ's Treatment of Medical Opinion Evidence</u>

Howarth also argues that the ALJ "improperly weighed the treating source opinion evidence" because he "applied internally inconsistent analysis to the opinions of Ms. Sylvia Rasie, APRN."  <u>See</u> Mot. to Reverse Mem. at 6.  The ALJ attributed great weight to the November 18, 2013 report of Nurse Rasie, cosigned by Dr. Randall (Exhibits 8F and 9F), and no weight to the November 18, 2014 report of Nurse Rasie (Exhibit 30F).  <u>See</u> Tr. at 21–22.  Howarth argues that the ALJ failed to provide good reasons for rejecting Nurse Rasie's 2014 report.  <u>See</u> Mot. to Reverse Mem. at 7.  He

---

[10] Howarth in his Memorandum in Support of the Motion to Reverse states that "Listing 12.04 is satisfied when paragraphs 'A' and 'B' or 'A' and 'C' are met or equaled."  Mot. to Reverse Mem. at 3.  The court notes that this is an incorrect statement of the law because Listing 12.04, at the time of April 3, 2015, was met "when the requirements in both A and B are satisfied, or when the requirements in C are satisfied."  20 C.F.R. § 404.1525 app. 1, Listing 12.04 (2015).

also argues that the ALJ misread the November 18, 2013 report by reading "very little bipolar disorder" where the report said "very brittle bipolar disorder." <u>See</u> <u>id.</u> at 6–7.

### 1. November 18, 2014 Report of APRN Rasie

Howarth challenges the ALJ's decision to grant no weight to Nurse Rasie's November 18, 2014 opinion, which he refers to as "treating source opinion evidence." Mot. to Reverse Mem. at 6. First, he argues that the ALJ failed to provide good reasons for rejecting the opinion. <u>See</u> <u>id.</u> at 7. He focuses on the ALJ's reasoning that "the records that she has provided are actually inconsistent with themselves and her opinion, which detracts from the reliability of the opinion." Tr. at 21. The ALJ cites to portions of the record in which Nurse Rasie's treatment notes were duplicated, but the more positive notes were removed and replaced with less positive notes. <u>Id.</u> at 21–22. Howarth argues that this replacement "is not relevant to the weight to be afforded her opinion" and that the ALJ should have sought clarification from Nurse Rasie. Mot. to Reverse Mem. at 7. Second, Howarth argues that, even if the opinion was denied controlling weight, the ALJ "failed to apply the analysis required by SSR 96-2p when a treating source's medical opinion is not entitled to controlling weight." <u>Id.</u> at 8.

The treating source rule requires that "[a] 'treating physician's' opinion is 'given controlling weight as long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" <u>Nieves v. Colvin</u>, No. 3:14-CV-01736, 2017 WL 1050569, at *4 (D. Conn. Mar. 20, 2017). Even if controlling weight is not given, "some weight may still be attached to that opinion, and the ALJ must still designate and explain the weight that is actually given to the opinion." <u>Schupp v. Barnhart</u>, No. 3:02CV103 (WWE), 2004 WL 1660579, at *9 (D. Conn. Mar. 12, 2004). The SSA provides a list of

factors to be considered in assigning weight to the medical opinion: (1) examining relationship; (2) treatment relationship, including length, frequency of examination, and nature and extent of the relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors. 20 C.F.R. § 404.1527 (2015). The SSA's regulations provide, "We will always give good reasons in our notice of determination or decision for the weight we give [the] treating source's medical opinion." 20 C.F.R. § 404.1527(c)(2) (2015); see also DiMauro v. Berryhill, No. 3:15CV1485 (DJS), 2017 WL 1095024, at *8 (D. Conn. Mar. 23, 2017).

While Howarth argues that the ALJ failed to meet these requirements for Nurse Rasie's 2014 opinion, his argument is misplaced because her 2014 opinion is not a treating source opinion, and therefore, this rule does not apply. Only an "acceptable medical source" can be considered a treating source. Social Security Ruling 06-03p, Titles II and XVI: Considering Opinions and Other Evidence From Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies ("SSR 06-03p"), 2006 WL 2329939, at *2 (Aug. 9, 2006);[11] see also 20 C.F.R. § 404.1527(a)(2) (2015) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources . . . ."). An APRN is not an acceptable medical source under section 404.1513(a) of title 20 of the Code of Federal Regulations, but rather an "other source"

---

[11] SSR 06-03p has since been rescinded, effective March 27, 2017. Rescission of Social Security Rulings 96-2P, 96-5P, and 06-3P, 2017 WL 3928305 (Mar. 27, 2017). However, SSR 06-03p was in effect at the time of the ALJ's Decision in 2015 and therefore still applies to the court's review.

under section 404.1513(d).[12]  20 C.F.R. § 404.1513 (2015).  Therefore, an APRN's opinion, such as Nurse Rasie's, does not receive the special consideration given to a treating source opinion under the rule above, and the ALJ did not err by failing to apply the analysis required of treating source opinions.  See Depoto v. Colvin, No. 3:16-CV-00254 (SRU), 2017 WL 417196, at *4 (D. Conn. Jan. 31, 2017); Godin v. Astrue, No. 3:11-CV-881 SRU, 2013 WL 1246791, at *2 (D. Conn. Mar. 27, 2013).

However, while not an acceptable medical source, Nurse Rasie's 2014 opinion is nonetheless entitled to some consideration.  SSR 06-03p states that the SSA considers "all relevant evidence in the case record," including medical sources who are not acceptable medical sources.  SSR 06-03p at *4; Cogdell v. Colvin, No. 3:14CV1334 (HBF), 2017 WL 1159091, at *8 (D. Conn. Mar. 28, 2017).  Evidence from "other sources" can be used "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function."  SSR 06-03p at *2.  These sources are "important and should be evaluated on key issues such as impairment severity and functional effects."  Id. at *3.  SSR 06-03p indicates that, in evaluating the weight to be accorded these "other sources," the ALJ should consider the same factors enumerated in sections 404.1527(d) and 416.927(d) of title 20 of the Code of Federal Regulations, and listed above, for evaluating medical opinions.  Id. at *4; see also Godin, 2013 WL 1246791, at *4.

---

[12] Section 404.1502 was amended, effective March 27, 2017, to add as an acceptable medical source a "Licensed Advanced Practice Registered Nurse . . . for impairments within his or her licensed scope of practice," but this change applies "only with respect to claims filed . . . on or after March 27, 2017."  20 C.F.R. § 404.1502 (2017).  Because Howarth's claim was filed prior to March 27, 2017, this change does not apply to his case, and Nurse Rasie is not an acceptable medical source.

Although the ALJ should consider the same factors in evaluating "other sources" as with treating sources, "other sources" do not require the same amount of deference as treating sources.  See SSR 06-03p at *5 ("The fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' because . . . 'acceptable medical sources' 'are the most qualified health care professionals.'"); Depoto, 2017 WL 417196, at *4; Perez v. Colvin, No. 3:13CV868 HBF, 2014 WL 4852836, at *2525 (D. Conn. Apr. 17, 2014), report and recommendation adopted, No. 3:13-CV-868 JCH, 2014 WL 4852848 (D. Conn. Sept. 29, 2014).  The ALJ therefore has discretion in determining the appropriate weight given to these "other sources."  See O'Connor v. Chater, 164 F.3d 618, at *1 (2d Cir. 1998); Hedman-Ouellete v. Soc. Sec. Admin., No. CIV. 3:07-CV-1462PCD, 2009 WL 497605, at *22 (D. Conn. Feb. 24, 2009); Nichols v. Comm'r of Soc. Sec. Admin., 260 F. Supp. 2d 1057, 1066 (D. Kan. 2003).  In doing so, the ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning."  SSR 06-03p at *6.  However, the ALJ is not required to "slavish[ly] recite [ ] each and every factor."  Depoto, 2017 WL 417196, at *4 (quoting Atwater v. Astrue, 512 Fed.Appx. 67, 70 (2d Cir. 2013)).

In Howarth's case, the ALJ did evaluate Nurse Rasie's November 2014 opinion and articulate his reasons for attributing it no weight.  See Tr. at 21–22.  First, the ALJ found that the opinion was not reliable because the treatment notes were inconsistent with each other.  See id.  Specifically, the treatment notes in Exhibits 13F and 26F are

duplicates of each other and contain notes from February 31, 2014,[13] March 3, 2014,

March 21, 2014, May 14, 2014, and July 7, 2014.  See id.  The treatment notes in

Exhibit 28F, submitted with the November 2014 report, are identical for dates February

31, 2014, and March 3, 2014, but replace the remaining three dates with notes instead

from September 15, 2014, and November 3, 2014.  See id.  The three dates removed

from Exhibit 28F contain more positive notes, such as "reports a stable mood," "looks

good," and "my spirits are up a bit."  See id. at 601.  The two dates that replaced those

notes are less positive, reporting decreased energy and increased slowness.  See id. at

623.  The ALJ found that this change to the same handwritten document "calls into

question the reliability of anything that has been provided by Ms. Rasie."  See id. at 22.

Howarth argues that the duplication and replacement is irrelevant, and that the

ALJ should have sought clarification from Nurse Rasie rather than affording the opinion

no weight.  See Mot. to Reverse Mem. at 7.  He claims that "all treatment notes from

APRN Rasie are contained in the record in one form or another, and nothing of

substance was altered or hidden."  Id.  The court agrees that the inclusion of different

notes does not necessarily undermine the credibility of the report because the content

of both sets of notes is not inconsistent.  It is possible that Howarth exhibited more

positive signs in March, May, and July, but less positive signs in September and

November because symptoms change.  It is, however, suspicious that the top half of the

notes is identical for the two initial dates, including identical handwriting, which leads the

court to wonder how what started as one piece of paper ultimately resulted in two

_____

[13] These are the dates as reported by the ALJ.  The court notes that the handwriting of Nurse
Rasie's treatment notes is difficult to read and, as there is no February 31, 2014, this could be either
February 3, 2014 or February 21, 2014.

different sets of notes. The ALJ was not required, though, as Howarth suggests, to recontact Nurse Rasie for clarification. See Masch v. Barnhart, 406 F. Supp. 2d 1038, 1056 (E.D. Wis. 2005) (holding that the requirement to recontact a treating source if the report has insufficient information does not apply to "other sources").

The court need not decide this question solely based on this unusual occurrence in the treatment notes, however, because the ALJ provided a second reason for rejecting the opinion, one that Howarth does not challenge. The ALJ found that even the less positive entries from September 15, 2014, and November 3, 2014, "do not support the level of functional limits that [Rasie] reported in 30F." Tr. at 22. The notes on September 15, 2014, and November 3, 2014, indicated that Howarth experienced "decreased energy" and increased loneliness, but also that he was sleeping better and had holiday plans. See id. at 623. Additionally, the duplicated notes from February 31 [sic], 2014, and March 3, 2014, also stated that he "remains stable," "looks good," states "my spirits are higher," and "had a good [weekend] socially" with his brother. See id.

The ALJ concluded that the more strongly negative conclusions in Nurse Rasie's 2014 opinion are inconsistent with this treatment record, and the court finds that he did not err in rejecting the opinion on this basis. See id. at 626–27; see also Slattery v. Colvin, 111 F. Supp. 3d 360, 372 (W.D.N.Y. 2015) (upholding the ALJ's decision to give little weight to an opinion because it was "inconsistent with the treatment record"). For example, the opinion observed marked difficulties in understanding and remembering complex instructions, obeying complex instructions, and responding appropriately to work stimulations and changes in routine work setting, but nothing in the treatment notes indicates marked limitations in any of these areas. See Tr. at 626–27.

Additionally, this is contrary to the other opinions in the record, which did not reflect any marked difficulties. See id. at 96, 122, 440–41, 444–45.

Thus, the court finds that the ALJ did not err because there was substantial evidence in the record supporting the ALJ's decision to assign no weight to Nurse Rasie's 2014 opinion. Additionally, because the problems with the opinion discussed above were not present in the 2013 opinion, it was not inconsistent for the ALJ to assign different weights to the two opinions. The 2013 opinion was also co-signed by Dr. Randall, an acceptable medical source, which further distinguishes it from the opinion signed by Nurse Rasie alone.[14]

Accordingly, the ALJ was within his discretion and did not err in assigning no weight to the 2014 opinion of Nurse Rasie. See Talavera v. Astrue, 500 Fed. App'x 9, 12 (2d Cir. 2012) (citing Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.")).

2.  November 18, 2013 Report of APRN Rasie, Co-signed by Dr. Randall

Regarding Nurse Rasie and Dr. Randall's November 2013 report, Howarth argues that the ALJ misread the report by substituting "very little bipolar disorder" for "very brittle bipolar disorder." See Mot. to Reverse Mem. at 6–7. It is not clear from Howarth's Memorandum whether he argues, because of the misreading, that the ALJ assigned too much weight to the report or that the ALJ's conclusion on RFC was not

_____

[14] "[I]gnoring the co-signature of a physician 'is significant because the opinion of even a nonexamining physician is entitled to consideration in accordance with the guidelines for evaluating all medical opinions,' whereas the opinion of a nurse, standing alone, is merely entitled to consideration as an 'other source.'" Godin, 2013 WL 1246791, at *3. Therefore, it was appropriate for the ALJ to consider Dr. Randall's co-signature as one factor in evaluating the 2013 opinion differently from the 2014 opinion.

supported by substantial evidence. The Commissioner responds that, despite this one word difference, the ALJ's decision was based on and accurately reflected the overall report as a whole. See Mot. to Affirm Mem. at 10. The court agrees with Howarth that the ALJ misquoted the report. However, the ALJ's findings were nonetheless supported by substantial evidence in the 2013 opinion, such that the misquoting was harmless and does not justify remand.

The ALJ stated of the report:

> They stated that the claimant had a significant improvement in his symptoms due to effectiveness of medication and that he had "very little bipolar disorder." . . . Moreover, the claimant was doing better than was noted by Ms. Schnier, as discussed above, who's assessment was prior to the opinion by Nurse Rasie and Dr. Randall. The undersigned notes that the claimant's problems appear to be addressed by the State agency psychologist, who evaluated the record at the reconsideration level and provided limitations that are consistent with the objective medical evidence of record.

Tr. at 21. He discusses the report in support of his conclusion that Howarth "has the residual functional capacity to perform a full range of work at all exertional levels but with [certain] nonexertional limitations." Tr. at 17. These include limitations of "carrying out simple routine and repetitive tasks doing routine work," "working in a nonpublic setting . . . that requires little collaboration or teamwork," and engaging in only "brief and superficial interaction with coworkers or supervisors." Id.

When an ALJ misreads the record, in some cases remand may be appropriate. See Rivera v. Astrue, No. 10 CV 4324 RJD, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012). However, courts in other instances have held the error to be harmless if the ultimate determination is nonetheless supported by substantial evidence. See Trombley v. Colvin, No. 8:15-CV-00567 (TWD), 2016 WL 5394723, at *4 n.6 (N.D.N.Y. Sept. 27,

2016) ("If the ALJ did misread the note, it would be harmless error in light of the substantial evidence supporting the non-severe determination."); <u>Coates v. Colvin</u>, No. 5:12-CV-1340 GLS, 2013 WL 3148222, at *4 (N.D.N.Y. June 19, 2013) ("While it appears that the ALJ misread the record evidence regarding the medication Coates was prescribed to alleviate her pain, it cannot be said that the ALJ's credibility determination was based largely on factual errors such that remand would be necessary.").

In Howarth's case, the ALJ either misread or misquoted the November 2013 opinion of Nurse Rasie and Dr. Randall. <u>See</u> Tr. at 21. Howarth is correct that "very little bipolar disorder" and "very brittle bipolar disorder" result in different interpretations of his condition, and that the opinion intended the latter.[15] <u>See</u> Mot. to Reverse Mem. at 7. However, the error was harmless because the ALJ's RFC analysis was supported by substantial evidence that included Howarth's own statements, the treatment notes of his healthcare providers, the other medical opinions in the record, and the rest of the November 2013 opinion. <u>See</u> Tr. at 17–23. For instance, the 2013 opinion stated that Howarth's appearance was "clean" and "neat," that his mental status was "alert" and "attentive" with "no memory or concentration deficits," that his mood was "appropriate," and that his judgment and insight were "excellent." Tr. at 443–44. The opinion also reported that he had only slight problems with most indicators of social interactions and task performance, with obvious problems only in "focusing long enough to finish assigned simple activities or tasks" and "performing work activity on a sustained basis." Tr. at 445. Read together, then, the overall conclusion of the November 2013 opinion

---

[15] The opinion does not define "very brittle bipolar." <u>See</u> Tr. at 444. Howarth understands the term to mean that "[a] person with a 'brittle' condition will rapidly deteriorate into irritability and decompensation." Mot. to Reverse Mem. at 7.

still supports the ALJ's RFC analysis.  In light of the substantial evidence in support of the ALJ's decision, the court cannot say that the ALJ's decision was largely based on this misreading, or that a correct reading of this one word would have changed the ALJ's ultimate determination.

Accordingly, despite the error in quoting the November 2013 opinion, the ALJ's decision was supported by substantial evidence, and the ALJ did not err in assigning great weight to the opinion.  Because the case is already being remanded on other grounds, however, the court urges the ALJ to correct his misreading of the 2013 opinion as to the word "brittle," and if appropriate, his conclusions.

## VI.    CONCLUSION

For the reasons stated above, the Motion for Order Reversing the Commissioner's Decision is **GRANTED** for reconsideration of whether Howarth meets or equals the criteria of paragraph C under Listing 12.04.  The Motion for Order Affirming the Decision of the Commissioner is **DENIED**.  The case is remanded to the ALJ for proceedings consistent with this Ruling.  The court also suggests that the ALJ use the opportunity on remand to revisit the other issues warranting improvement, as discussed in the Ruling, even though they are not themselves the basis for the remand.

The Clerk's Office is instructed that, if any party appeals to this court the decision made after this remand, any subsequent social security appeal is to be assigned to the District Judge who issued this Ruling.

**SO ORDERED.**

Dated at New Haven, Connecticut this 19th day of December, 2017.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge